UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

BROCK WILLIAMS,

        Plaintiff,

   v.

MID-AMERICA CONVERSION
SERVICES, LLC,

        Defendant.

Case No. 2:22-cv-2052
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court on Defendant Mid-America Conversion Services, LLC's Motion for Summary Judgment. (Mot., ECF Nos. 18, 19.) Plaintiff Brock Williams opposed (Opp., ECF No. 22), and Mid-America replied (Reply, ECF No. 24). For the reasons below, the Court **GRANTS** Mid-America's Motion for Summary Judgment.

## BACKGROUND

### I. Factual Background

Mid-America manages around 800,000 tons of Depleted Uranium Hexaflouride ("DUF6") at two conversion facilities at United States Department of Energy sites near Paducah, Kentucky and Piketon, Ohio. (Lindsay Decl., ECF No. 19-1, ¶ 2.) DUF is a radiological material and a byproduct of processing uranium for use in nuclear weapons and in the commercial nuclear industry. (*Id.* ¶ 3.) The conversion facilities safely store and convert more than 63,000 large cylinders of DUF6 byproduct into a more stable form that can be reused, stored, or disposed of. (*Id.* ¶ 4.)

Between February 18, 2019 and February 24, 2021, Mr. Williams worked as a Health Safety Technician – Radiological ("Technician") for Mid-America at its Piketon facility. (Williams Dep., ECF No. 19-3, PageID 307, 361.)

### A. Mr. Williams's job duties as a Technician included radiation work.

As a Technician, Mr. Williams was "responsible for monitoring radiation levels within the facility and detecting contamination." (Lindsay Decl. ¶ 7.) As part of his job duties, Mr. Williams was to: provide "radiological monitoring and job coverage support for all DUF6 operations and maintenance activities"; "[c]onduct radiological safety walk-downs and pre-job walk downs"; and "maintain[] performance tests and operate[] radiological monitoring equipment." (Position Description, ECF No. 19-3, PageID 411.) Mr. Williams's Position Description also made clear that the facility environmental working conditions included frequent "[r]adiation work." (*Id.*)

Supporting the DUF6 operations required Mr. Williams to work in the Radiological Material Area ("RMA") of the facility where DUF6 was stored. (Position Description, PageID 411; Lindsay Dep., ECF No. 19-2, PageID 218–19.) Due the nature of the work at Mid-America, all employees risked exposure to some level of radiation. (Lindsay Dep. PageID 199.) By working in the RMA, however, Mr. Williams was exposed to radiation levels higher than the rest of the facility. (*Id.*)

### B. Mr. Williams had surgery on his hand.

On December 5, 2019, after he had been working for Mid-America for about ten months, Mr. Williams underwent surgery on his hand, which had been crushed at a previous job, leaving him with chronic pain. (Williams Dep. PageID 322.) Mid-America accommodated Mr. Williams's surgery and subsequent recovery. (*Id.*) Mr. Williams kept working with accommodations related to no-lifting and no use of his right arm until the Covid-19 pandemic led

Mid-America to suspend its operations. (*Id.* PageID 315.) Mid-America placed about 65% of its

Piketon employees on paid leave, including Mr. Williams. (Lindsay Decl. ¶ 10.) Mr. Williams

remained on paid leave from March 26, 2020 through August 16, 2020. (*Id.*)

### C.  Mr. Williams received a spinal cord stimulator device to reduce chronic pain in his hand.

While on pandemic leave, Mr. Williams participated in a medical trial for a temporary

spinal cord stimulator device whose purpose was to reduce his chronic pain. (Williams Dep.

PageID 314–15, 321–22.) The temporary device reduced his pain from a 10/10 to a 3/10, so Mr.

Williams decided to have the device permanently implanted and attached to his vertebra. (*Id.*)So

less than a month after he returned to work post-pandemic, on September 5, 2020, Mr. Williams

underwent another surgery to alleviate the his chronic pain. (*Id.* PageID 321–22, 417.)

Following the surgery to permanently implant the spinal cord stimulator, on October 12,

2020, Mr. Williams returned to work with a two-week, 15-pound weightlifting restriction. (*Id.*

PageID 323.) Mid-America accommodated this restriction. (*Id.*)

### D.  Mr. Williams's stimulator device experienced technical issues due to radiation exposure.

Shortly after his return to work, Mr. Williams asked to be moved to a position that kept

him away from radiation exposure. Mr. Williams's stimulator device had randomly shut off at

least once while at work, leaving him in extreme pain. (Williams Dep. PageID 323–24, 333.) On

October 22, 2020, Mr. Williams wrote to Mid-America:

> I was informed by the company that issued my spinal cord stimulator that I will be required to turn off my stimulating device while at work due to the wear and tear that the radiation exposure will have on the device. This will cause me to lose the ability again to use my right hand due to severe pain. I will also be required to be on permanent work restriction. Are there any accomidations (*sic*) that the company could offer or jobs that could be performed that would keep me away from radiation exposure so my device doesn't need to be turned off?

(*Id.* PageID 420.)

### E.  Mid-America requested more information on acceptable levels of radiation.

Mid-America asked for the acceptable radiation levels Mr. Williams's stimulator device could tolerate. (Williams Dep. PageID 421.) Given that all employees in Mid-America's facilities are exposed to some minimal level of radiation, Mid-America felt it necessary to understand what level of radiation, if any, Mr. Williams could be exposed to, in order to evaluate whether Mid-America had any positions available for Mr. Williams. (Lindsay Decl. PageID 187.) Mid-America asked for formal direction from Mr. Williams's doctors. (Lindsay Dep. PageID 222–23.)

On October 26, 2020, Mr. Williams forwarded Rob Lindsay, the Environmental Safety and Health Manager at Mid-America, Guidelines that Boston Scientific had provided to him for his stimulator device. (Williams Dep. PageID 425–26.) Under "Precautions," the Guidelines explained that "[t]he following medical therapies or procedures may turn stimulation off or may cause permanent damages to the Stimulator, particularly if used in close proximity to the device . . . radiation therapy (Any damage to the device by radiation may not be immediately detectable)." (*Id.* PageID 439–40.) The Guidelines further instructed "[e]very effort should be taken to keep fields, including current, radiation, or high-output ultrasonic beams, away from the IPG [Implantable Pulse Generator]." (*Id.* PageID 443.)

The next day, Mr. Williams provided Mid-America with a note from his doctor, Dr. Hoyt: "[e]very effort should be taken to keep fields, including current/radiation/high intensity output/Ultrasonic beams away from the [device]." (ECF No. 22-1, PageID 747.) Later, Dr. Hoyt stated "[a]fter further evaluation and talking with Boston scientific [Mr. Williams] found that he can't have the stimulator turned on at the nuclear plant he works at." (*Id.*)

4

Mid-America informed Mr. Williams that it needed more information about the device's radiation tolerance. (Williams Dep. PageID 464–65.) In the meantime, Mid-America placed Mr. Williams on light duty. (*Id.*) It offered this temporary accommodations to minimize Mr. Williams's radiation exposure. (Lindsay Decl. PageID 187.) Mr. Williams accepted that accommodation and continued to receive full-time pay. (*Id.*)

In the following months, Mid-America sought to glean additional information from Mr. Williams's treating physicians.[1] On November 3, 2020, Mid-America sent a letter to Dr. Hoyt for more information on whether Mr. Williams's limitations were temporary or permanent restrictions. (Lindsay Dep. PageID 212–13.) Before Dr. Hoyt could respond, Mr. Williams contacted Mid-America and asked that it stop contacting his doctors directly. (Williams Dep. PageID 339, 467.) Mid-America obliged, but informed Mr. Williams that his treating physician would need to provide the requested clarifying information. (*Id.*) Mr. Williams informed Mid-America that Dr. Leon Briggs, not Dr. Hoyt, was his treating physician. (*Id.* PageID 346.)

Mid-America then provided Mr. Williams with a letter for him to provide to Dr. Briggs requesting more information about Mr. Williams's restrictions. (ECF No. 22-1, PageID 770.) At first, Dr. Briggs informed Mid-America that he could not comment on Mr. Williams's work restrictions with the device without reviewing a Functional Capacity Evaluation ("FCE") conducted by a licensed therapist. (Williams Dep. PageID 350–51.) But before the FCE, on

---

[1] During this back and forth between Mr. Williams, Mid-America, and Mr. Williams's doctors, in December 2020, Mr. Williams began making complaints that he was being discriminated against because of his disability. His first complaint alleged that a Mid-America employee—Joy Meade—was creating a hostile work environment by sending him an email that he perceived as overbearing and as shouting at him. (ECF No. 22-1, PageID 759.) In that email, Ms. Meade wrote in response to Mr. Williams's question about whether his doctor had sent a letter: "It was faxed TODAY. Yes I did receive and they told me you were mailed a copy. I will share with Rob and Sonie." (Williams Dep. PageID 478.)

December 14, 2020, Mr. Williams provided Mid-America with another note from Dr. Briggs which stated:

> I understand there is some question about [Mr. Williams] using his spinal cord stimulator while at work. I have reached out to the manufacturer who will have an answer ASAP. In (*sic*) mean time the recommendation is that he wear a lead vest while on the job. I am ordering an FCE at your request.

(Williams Dep. PageID 482.) Mid-America received an update from Dr. Briggs on January 14, 2021, after he had reviewed Mr. Williams's FCE. Dr. Briggs concluded that Mr. Williams's restrictions were "permanent" and Mr. Williams should be limited to "light level of work 8 hrs/day or 40 hours/week." (Williams Dep. PageID 496–97.) Dr. Briggs's assessment did not address whether Mr. Williams needed to avoid all exposure to radiation, or what levels of radiation exposure, if any, would be acceptable. (*Id*.)

Mr. Williams requested that he be transferred to Mid-America's Count Lab to fill a vacant position. (Lindsay Dep. PageID 234.) Mid-America's Count Lab is in a RMA and is where smear samples are analyzed. (Lindsay Decl. ¶ 20.) Mid-America chose not to transfer Mr. Williams and offered a few reasons for why that transfer could not be accommodated: the position was for 10 hour/day shifts, which would exceed Dr. Briggs's recommended limitation of 8 hours/day; and Mid-America could not be sure that the Count Lab position would not expose Mr. Williams to radiation. (*Id*.) To access the Count Lab, the Mid-America employee "would have to walk directly by cylinders containing radioactive materials in order to get to and from the Count Lab and would be handling samples of potential nuclear contamination." (*Id.*)

**F. Mr. Williams resigned after being placed on temporary unpaid medical leave.**

On January 29, 2021, Mid-America placed Mr. Williams on an unpaid medical leave of absence pending either a change in his radiation restrictions or clarification regarding his restrictions. (Lindsay Decl. ¶ 22.) In its letter doing so, Mid-America explained:

Considering the aforementioned restrictions as a whole, the Company's understanding is that you are prohibited from performing shift work which may involve working more than 40 hours in any given week, that your stimulator must be off at work, that you are to be kept away from fields of current, radiation, high intensity output and ultrasonic beams of any level, and that you may not use your right upper extremity while at work. We request that you confirm that you are under no additional medical restrictions at this time. To the extent you receive any additional medical restrictions or updated medical restrictions, please provide that information to Susie Ross as soon as possible.

. . . .

In light of the aforementioned restrictions, the Company has ascertained that the only sustainable reasonable accommodation available to it, in light of the nature of the Company's work, is to accommodate your restrictions by offering you a temporary unpaid leave of absence to be reviewed every three months. Most significantly, as you are aware, the Company manages depleted uranium hexafluoride (DUF6). Your position of Health Safety Technician – Radiological requires radiological monitoring and testing which necessitates potential frequent and unpredictable radiation exposure and the occasional exposure to equipment and machinery with high intensity outputs. In addition, given that the facility houses DUF6, a radioactive material, all positions within this facility risk some level of radiation exposure. Your doctor has restricted you from any level of radiation exposure, and the Company will be unable to offer you a position within the facility at this time that complies with these restrictions, as no such positions exist.

Please note that the Company has considered accommodation suggestions that you have raised, such as being transferred to a position where you could keep your device "on" and use both arms, be permitted to work in your current role with the device off, or being permitted to use a lead vest that would enable you to leave the stimulator "on." However, none of those proffered suggestions would fully comply with all of the restrictions that have been placed on you.

Should your restrictions change, the Company will reevaluate the offered accommodation.

(Unpaid Leave Letter, Williams Dep. PageID 492–94.)

Mr. Williams rejected Mid-America's offer of unpaid leave, and Mid-America placed him on leave while it considered what to do given Mr. Williams's rejection. (Williams Dep. PageID 260–63; Meeting Transcript, ECF No. 19-7, PageID 613.) Mr. Williams voluntarily

resigned from his employment on February 24, 2021; he felt his termination was "imminent" and alleged that he was constructively discharged. (Williams Dep. PageID 362–63.)

## II.    Procedural Background

Mr. Williams filed this lawsuit in the Pike County Court of Common Pleas on March 21, 2022. (ECF No. 1-1.)  Soon after, the case was removed to this Court. (Not. of Removal, ECF No. 1.)  Mr. Williams brings causes of action for failure to accommodate and disability discrimination under the Americans with Disabilities Act ("ADA") and corresponding state statutes; a state law retaliation claim; and a common-law claim for violating public policy. (Compl., ECF No. 5, ¶¶ 68–152.) After discovery closed, Mid-America filed its Motion for Summary Judgment. (Mot.)

### STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence

is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## ANALYSIS

As a preliminary matter and as this Court has noted, "Ohio disability discrimination law generally applies the same analysis as the ADA." *Schwendeman v. Marietta City Sch.*, 436 F. Supp. 3d 1045, 1059 (S.D. Ohio 2020), *aff'd*, No. 20-3251, 2020 WL 7711327 (6th Cir. Dec. 14, 2020) (citing *Johnson v. JPMorgan Chase & Co.*, 922 F. Supp. 2d 658, 674 n.6 (S.D. Ohio 2013)). Ohio courts "look to regulations and cases interpreting the [ADA] for guidance in [their] interpretation of Ohio law." *Id.* (citing *Johnson*, 922 F. Supp. 2d at 674 n.6).

Thus, as the parties do, the Court will analyze Counts I and II together, as well as Counts III and IV. The Court will begin with Counts III and IV.

## I.    Failure to Accommodate (Counts III and IV)

Employers covered by the ADA are prohibited from discriminating "against a qualified individual on the basis of a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Claims brought under this statute "are evaluated under the *McDonnell-Douglas* burden-shifting regime." *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 735 (6th Cir. 2015) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178–85 (6th Cir. 1996)). If a plaintiff establishes his prima facie case "the burden shifts to the defendant 'to articulate some legitimate, non-discriminatory reason' for its actions." *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (quoting *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001)). "If the defendant can satisfy its

burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." *Id.*

According to the Act, discrimination includes a failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A). To establish a prima facie failure-to-accommodate claim, Mr. Williams must show that (1) he was disabled within the meaning of the ADA; (2) he was otherwise qualified for his position, with or without a reasonable accommodation; (3) Mid-America knew or had reason to know of his disability; (4) he requested an accommodation; and (5) Mid-America failed to provide the necessary accommodation. *Brumley v. UPS*, 909 F.3d 834, 839 (6th Cir. 2018) (citation omitted).

Mid-America argues that Mr. Williams cannot establish elements (2), (4), and (5) of his prima facie failure-to-accommodate claim. (Mot. PageID 161–71.) It does not dispute elements (1) and (3).

### A. An essential function of Mr. Williams's job as a Technician was radiation work and restrictions were placed on his radiation exposure.

Mid-America argues that Mr. Williams cannot establish he was otherwise qualified for his position, with or without a reasonable accommodation. (Mot. PageID 161–62.) Mid-America contends that after Mr. Williams had his spinal cord stimulator implanted, he was no longer able to perform the essential functions of his job as a Technician because the position required frequent exposure to radiation. (*Id.* PageID 161.) "[T]he sole purpose of the position was to look for nuclear contamination," Mid-America urges. (*Id.*) Mr. Williams responds that radiation

exposure was not a condition of his job and he was never restricted from being exposed to radiation. (Opp. PageID 669.)

A "qualified individual with a disability" is defined under the ADA as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). When determining whether something is an essential job function, "consideration shall be given to the employer's judgment as to what functions of a job are essential," as well as any written description of the job. *Id.*

Because the parties dispute it, the Court must first determine whether radiation work was an "essential function" of Mr. Williams's position. Mr. Williams makes the somewhat technical argument that "radiation work," which is listed as a working condition on the Technician Position Description is different from radiation exposure, and "[n]owhere in the Job Description does it state radiation exposure is a condition of the job. This argument is unpersuasive.

"Radiation work" is listed under "Environmental Conditions" in the working conditions section on the Technician Position Description. (Williams Dep. PageID 412.) Each working condition is marked at either "F = Frequently, O = Occasionally, and N = Never," based on the frequency of the function. (*Id.*) Next to radiation work, the "F" box is checked. (*Id.*) Additionally, the Position Descriptions details other responsibilities indicating Mr. Williams's job was to monitor and look for areas of radiation exposure and contamination. (*Id.* PageID 411–12.) Mid-America highlights testimony that supports this conclusion. (Reply PageID 1321; *see, e.g.*, Ridgley Decl., ECF No. 24-1, ¶ 5 ("I was personally involved in the creation of the job description for the HST-RAD position. The frequent "radiation work" referenced in the HST-RAD job description means that the HST-RAD job requires frequent exposure to radiation.");

Lindsay Dep. PageID 199; Lindsay Decl. ¶ 5.) The Court finds that radiation work (or exposure) was, indeed, an essential function of Mr. Williams's job as a Technician.

Next, the parties contest whether Mr. Williams was restricted from radiation exposure. Mr. Williams argues that he was never restricted from being exposed to radiation (Opp. PageID 669), but his own emails to Mid-America belie such a conclusion too. (Williams Dep. PageID 420) ("I was informed by the company that issued my spinal cord stimulator that I will be required to turn off my stimulating device while at work"); (Williams Dep. PageID 425–26) (forwarding Boston Scientific Guidelines to Mid-America).

Mr. Williams asserts that Mid-America has "latched onto and hyper-focused" on Dr. Hoyt's clinical note that "[e]very effort should be taken to keep fields, including current/radiation/high intensity output/Ultrasonic beams away from the [device]." (Opp. PageID 669; *see* Lindsay Dep. PageID 224; ECF No. 22-1, PageID 747.) But Dr. Hoyt's note bolsters Mr. William's own statements to the company. It does not follow—despite Mr. Williams's urging—that simply because his treating physician Dr. Briggs did not list radiation exposure as a restriction, that radiation exposure was no longer a safety risk for Mr. Williams when Dr. Briggs drafted his report. (Williams Dep. PageID 497.) In fact, the report on which Mr. Williams relies to argue Dr. Briggs did not restrict his radiation exposure is dated January 14, 2021, but indicates it is based on an evaluation of Mr. Williams by Dr. Briggs on December 14, 2020. (*Id.*) Dr. Briggs wrote a letter to Mid-America the same day (December 14, 2020) suggesting that while he got in touch with Boston Scientific, Mr. Williams should "wear a lead vest while on the job" "in the meantime." (*Id.* PageID 482.)

Because radiation work is an essential function of Mr. Williams's Technician role at Mid-America, the next question is: could Mr. Williams perform this essential function with a reasonable accommodation? *See* 42 U.S.C. § 12111(8).

### B. The precise limitations of Mr. Williams's disability were unclear, so the parties could not determine reasonable accommodations.

Mid-America contends that Mr. Williams cannot establish that he requested a reasonable accommodation. (Mot. PageID 162–63.) It argues that the three accommodations Mr. Williams proposed were not objectively reasonable. (*Id.*) Mr. Williams views the situation differently, arguing Mid-America refused to accommodate his disability, despite his reasonable requests. (Opp. PageID 675.)

The Sixth Circuit has said that an employee "bears the burden of proposing reasonable accommodations" and a failure to accommodate claim "must be dismissed if the employee fails to identify and request such reasonable accommodations." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x. 974, 983 (6th Cir. 2011). The employee must also show the accommodation is "objectively reasonable." *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004). But identification of a reasonable accommodation should be through an "interactive" process:

> The ADA does not obligate employers to make on-the-spot accommodations of the employee's choosing. Under the ADA, an employer must engage in an "informal, interactive process" with the employee to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." [*Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007)] (quoting 29 C.F.R. § 1630.2(o)(3)). For employees seeking accommodations, "the interactive process is mandatory, and both parties have a duty to participate in good faith." *Id.*; *see also EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009) ("Once an employee makes such a request . . . the employer is obligated by law to engage in an interactive process: a meaningful dialogue with the employee to find the best means of accommodating th[e] disability." (internal quotation marks and citation omitted)).

*Brumley*, 909 F.3d at 840. A party fails to engage in the process in good faith when, for example, he or she causes "unnecessary delays or obstruct[s] the process" or "fail[s] to adequately

13

communicate or provide information during the process." *Id.* (citing *Kleiber,* 485 F.3d at 871; *accord Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)). "An employer's refusal to provide an accommodation to the position of the employee's choice immediately upon the employee's request is not, in and of itself, a failure to accommodate under the ADA." *Id.*

Mr. Williams characterizes his three accommodation requests as follows: (1) a request to be transferred to a position in the Count Lab that had been recently vacated; (2) a request to continue working as a Technician under the same restrictions that he had been (no use of his right arm); and (3) a request to continue working as a Technician with his stimulator device on while wearing a lead vest. (Opp. PageID 675.) The parties debate whether such requested accommodations were reasonable. (*See* Mot. PageID 162–63; Opp. PageID 675; Reply PageID 1324.)

From the Court's vantage point, however, the precise limitations resulting from Mr. Williams's disability had not been fully identified, and therefore, it became unclear to both parties what reasonable accommodations, if any, could work. *See Brumley*, 909 F.3d at 840; *Kleiber*, 485 F.3d at 871. After Mr. Williams's October 22, 2020 email informing Mid-America that his device might need turned off because of radiation exposure wear and tear, Mid-America went back and forth with Mr. Williams, attempting to discern what radiation levels the device could tolerate, if any. Such information was important because "all employees working at [Mid-America]'s Paducah and Piketon facilities involve exposure to radiation, however some positions require more frequent exposure than others." (Lindsay Decl. ¶ 5; *see also* Williams Dep. PageID 421 (Rob Lindsay October 22, 2020 email to Mr. Williams stating: "Will you please provide the technical information regarding acceptable radiation levels for the unit and any written direction

you have which directs you to turn the unit off?"); PageID 423 (Mr. Lindsay October 26, 2020 email asking Mr. Williams to "[p]lease talk with your surgeon about the information you have, regarding the device being degraded by radiation"); PageID 465 (Mr. Lindsay October 29, 2020 email to Mr. Williams explaining Mid-America needed "more information from your doctor").)

Without that necessary clarity, Mid-America could not be sure Mr. Williams's requested accommodations would allow him to perform the essential functions of his job safely. As to his first request to be transferred the Count Lab, the evidence indicates he could still be exposed to radiation. (*See* Lindsay Decl. ¶ 20.) Mr. Williams could not continue working as a Technician without more information on acceptable levels of radiation exposure, either.

Mr. Williams urges that the levels of radiation he was exposed to were minimal. He highlights a statement Darin Ridgley, Mid-America's Radiological Control Program Manager, made indicating his low levels of exposure were not enough to cause trouble with electronic devices. (Opp. PageID 678.) He also argues that his "Cumulative Occupational Radiation Exposure History report from the DOE" indicates he was "never exposed to any detectable amount of radiation while employed with [Mid-America]." (Opp. PageID 647.) Mid-America offers evidence to refute these arguments (Ridgley Decl. ¶ 9), but there are two preliminary problems with Mr. Williams's arguments.

First, Mr. Ridgley is not a physician or device manufacture who could appropriately weight in on the safety issues related to Mr. Williams's stimulator device. Second, Mr. Williams's historical exposure to radiation at Mid-America is of minimal relevance. As soon as the stimulator device shut off, Mid-America acted to keep Mr. Williams away from radiation. Also, as Mr. Ridgely explains, the dosimeter Mr. Williams wore on which the DOE report was

based, only measured certain levels of radiation. (Ridgley Decl. ¶ 9.) The parties didn't know what levels (if any) were safe.

Finally, as for the lead vest, review of Dr. Briggs's email in context indicates he suggested the lead vest be used as a temporary measure. (Williams Dep. PageID 482 ("I have reached out to the manufacturer who will have an answer ASAP. *In the mean* time the recommendation is that he wear a lead vest while on the job.") (emphasis added).)

Consideration of the evidence collectively shows that Mid-America was reasonable in determining Mr. Williams could not safely work at its facility where he would be exposed to radiation that would harm his stimulator device without a statement from one of his physicians to the contrary.[2] *See Johnson v. Cleveland City Sch. Dist.,* 443 F. App'x 974, 986 (6th Cir. 2011) ("The doctors' restrictions must be taken at face value and the District was reasonable—indeed, correct—to assume that Johnson could not perform a task that her doctors indicated she was incapable of safely performing."); *see also Jakubowski v. Christ Hosp., Inc.,* 627 F.3d 195, 202 (6th Cir. 2010) (medical resident did not meet his burden under the ADA of proving he was an otherwise qualified individual where his proposed accommodation prevented him from performing the necessary functions); *Manigan v. Sw. Ohio Reg'l Transit Auth.,* 385 F. App'x 472, 478 (6th Cir. 2010) (upholding summary judgment for employer when truck driver could not drive more than eight hours when the route required, an essential function of his position) *Denczak v. Ford Motor Co.*, 215 F. App'x 442, 445 (6th Cir. 2007) (production line-worker was

---

[2] When Mid-America put Mr. Williams on unpaid leave on January 29, 2021—about three months after Mr. Williams's initial email about radiation exposure—the company informed Mr. Williams that if he received "any additional medical restrictions or updated medical restrictions," he was to provide that information as "soon as possible." (Unpaid Leave Offer Letter, ECF No. 19-3, PageID 492; *see also* PageID 493 ("Should your restrictions change, the Company will reevaluate the offered accommodation.").)

not otherwise qualified for the job where he could not meet or at least approach a product-line quota because that was an "essential function" of his job).

Mr. Williams has not made an adequate showing that he was otherwise qualified for the position, with or without a reasonable accommodation. He has therefore not established his prima facie failure-to-accommodate claim. Summary judgment is **GRANTED** as to Counts III and IV.

## II.     Disability Discrimination (Counts I and II)

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he was otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse action; (4) the employer knew or had reason to know of his disability; and (5) he was replaced or the job remained open. *Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012) (citing *Plant v. Morton Int'l Inc.*, 212 F.3d 929, 936 (6th Cir. 2000)). Element (2) of a disability discrimination claims is the same as element (2) of a failure-to-accommodate claim. Thus, for the same reasons as stated above, Mr. Williams cannot establish element (2) of his disability discrimination claim. Summary judgment on Counts I and II is **GRANTED.**

## III.     Retaliation (Count V)

Mr. Williams also brings a retaliation claim, contending Mid-America "retaliated against [him] for submitting his numerous complaints of discrimination, harassment, and hostile work environment." (Opp. PageID 682.) While it appears Mr. Williams brings his retaliation claim only under Ohio law, the Court will construe his claim as both under the ADA and Ohio law (as Defendant does). (*See* Opp. PageID 171); *Schwendeman v. Marietta City Sch.*, 436 F. Supp. 3d at 1059.

17

To establish a prima facie claim of retaliation under Ohio law and the ADA, Mr. Williams must prove that: (1) he engaged in a protected activity, (2) Mid-America was aware of that activity, (3) Mid-America took an adverse employment action against Mr. Williams, and (4) there is a causal connection between the protected activity and the adverse action. *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007); *A.C. ex rel. J.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013); O.R.C. § 4112.02(I) (it is "an unlawful discriminatory practice . . . [f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section[.]"). Mid-America argues Mr. Williams cannot show elements (3) and (4) of his prima facia retaliation claim. The parties agree that Mr. Williams made several complaints of alleged discrimination and harassment beginning on December 1, 2020, and that those complaint constituted protected activities of which Mid-America was aware. (*See* Mot. PageID 172; Opp. PageID 684; Reply PageID 1335; ECF No. 22-1, ECF No. 759.)

### A. Adverse Actions

Mr. Williams contends Mid-America took two adverse actions against him: (1) it placed him on involuntary, unpaid leave on January 29, 2021, and (2) it constructively discharged him on February 24, 2021. (Opp. PageID 683.) Mid-America responds these actions did not constitute adverse actions. (Reply PageID 1332–34.)

"The Sixth Circuit has not directly addressed whether unpaid medical leave is an adverse employment action." *Squiers v. Washtenaw Cnty.*, No. 21-11956, 2023 WL 3506422, at *4 (E.D. Mich. May 17, 2023), *reconsideration denied*, No. 21-11956, 2023 WL 4565463 (E.D. Mich. July 17, 2023). Courts in the Fourth and Fifth Circuits have held that unpaid medical leave is not an adverse employment action. *See, e.g.*, *Austgen v. Allied Barton Sec. Servs., L.L.C.*, 815 F. App'x 772, 776 (5th Cir. 2020) (holding that placing an employee on temporary unpaid leave is

not an adverse employment action); *Klik v. Verizon Virginia Inc.*, No. 6:15-CV-00002, 2016 WL 917499, at *7 (W.D. Va. Mar. 8, 2016), *aff'd,* 669 F. App'x 162 (4th Cir. 2016) ("The unpaid leave that [plaintiff] received is not an adverse employment action but rather a reasonable accommodation."). But the Court need not decide that issue today, or whether Mr. Williams was constructively discharged, because it finds that Mr. Williams has not shown causation, as he must.

### B. Causation

Mr. Williams argues: "Here, the temporal proximity, alone, sufficiently establishes a causal connection between Mr. Williams's protected activity and the adverse activities. Less than two months after his first complaint, and the same day as his last complaint, [Mid-America] put Williams on an involuntary unpaid leave of absence, . . . ." (Opp. PageID 686.)

While the case law is unclear as to whether temporal proximity standing alone establishes a causal connection for a retaliation claim, often, it is not. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) ("Closeness in time is one indicator of a causal connection*, . . .* but temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim." (citing *Little v. BP Expl. & Oil Co.,* 265 F.3d 357, 364–65 (6th Cir. 2001); *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007)); *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 524 (6th Cir. 2008) (explaining "one could read the Supreme Court as having accepted that temporal proximity may be sufficient in a narrow set of cases"). In any event, this case is not one that falls into that narrow set.

About two months passed between the time Mr. Williams made his first complaint and was put on unpaid medical leave—not merely a few days or few weeks. During that time, Mr. Williams, Mid-America, and Mr. Williams's doctors continued communication. (*See, e.g.*, Williams Dep. PageID 479–91.) Mid-America sought to obtain other information on Mr.

19

Williams's stimulator device and its radiation tolerance, if any. Moreover, Mr. Williams first complained to Mid-America on December 1, 2020 (Opp. 684), but Mid-America was concerned well before that in October 2020 when Mr. Williams had sent the first email about his stimulator device shutting off. "[E]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Sosby v. Miller Brewing Co*., 415 F. Supp. 2d 809, 822 (S.D. Ohio 2005), *aff'd*, 211 F. App'x 382 (6th Cir. 2006) (citations omitted).

Accordingly, Mr. Williams has not established his prima facie claim of retaliation and summary judgment is **GRANTED** on Count V.

## IV.    Public Policy (Count VI)

Mr. Williams also brought a claim for violation of public policy, maintaining that his firing violated a clear public policy "manifested in Ohio statutes and/or administrative regulations, or in the common law, against terminating and/or retaliating against an employee because he engages in a protected activity." (Compl. ¶¶ 140–152.) Mid-America moves for summary judgment on this Sixth Count too, arguing Mr. Williams's public policy claim fails as a matter of law because Ohio Revised Code § 4112 adequately protects the interests of society and Mr. Williams in protecting against disability discrimination. (Mot. PageID 181) (citing *McMillen v. Fraley & Schilling, Inc.*, No. 1:05 CV 1699, 2006 WL 8447100, at *2 (N.D. Ohio Jan. 3, 2006); *Caplinger v. Uranium Disposition Servs., LLC*, No. 2:08-CV-548, 2009 WL 367407, at *6 (S.D. Ohio Feb. 11, 2009) (Graham, J.).

Mr. Williams does not oppose dismissal of this count in his response. (*See generally* Opp.) For that reason and because Mid-America's argument is well-grounded, summary judgment is also **GRANTED** on Count Six.

## CONCLUSION

For the stated reasons, the Court **GRANTS** Mid-America's Motion for Summary

Judgment on all Counts. (ECF No. 18.) The Clerk is **DIRECTED** to **ENTER JUDGMENT** and

**CLOSE** the case.


**IT IS SO ORDERED.**

<u>**12/11/2023**</u>                                        <u>**s/Edmund A. Sargus, Jr.**</u>
**DATE**                                             **EDMUND A. SARGUS, JR.**
                                               **UNITED STATES DISTRICT JUDGE**